UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

UNITED STATES OF AMERICA,

                Plaintiff,

      v.

BERNARD FREEMAN,

                Defendant.
_____

DECISION & ORDER

04-M-4078

**PRELIMINARY STATEMENT**

On August 9, 2004, the government filed a four-count Information against defendant Bernard Freeman ("Freemen"). (Docket # 1). According to the Information, at all relevant times, the Volunteers of America of Western New York, Inc. ("VOA") was under contract with the United States Probation Office for the Western District of New York to provide residential services for defendants for whom the court had set pretrial or probation release conditions. (Docket # 1). Freeman was employed by the VOA as a Public Safety Officer whose duties included prohibiting and reporting any unauthorized absence from the VOA by the residents placed there by the United States Probation Office. (Docket # 1).

The Information charges that Freeman violated court orders by allowing certain individuals to leave the VOA without authorization. Specifically, the Information details four criminal cases, *United States v. Dennis Griner*, Case No. 99-CR-6030L (Count One), *United States v. Mathis Lee Brown*, Case No. 99-CR-6061T (Count Two), *United States v. Khalid Price*, Case No. 99-CV-6071 (Count Three), and *United States v. Lashawn Cason*, Case No.

99-CV-6052T (Count Four), in which United States Magistrate Judge William G. Bauer ordered that the respective defendants reside at the VOA on twenty-four hour lockdown, with all absences to be approved by the United States Probation Office.  According to the Information, between August 10, 1999 and August 26, 1999, Freeman willfully, knowingly and unlawfully disobeyed and resisted Judge Bauer's orders by allowing the four defendants, in exchange for things of value, to leave the VOA without authorization from the United States Probation Office, in violation of 18 U.S.C. § 401(3).  (Docket # 1).

Currently pending before this Court for a decision and order is Freeman's motion to suppress statements.[1]  (Docket ## 16, 21).  For the following reasons, it is the order of this Court that Freeman's motion be denied.

## FACTUAL BACKGROUND

On June 13, 2005, this Court held a hearing on Freeman's motion.  At the hearing, the government offered the testimony of two agents with the Federal Bureau of Investigation, Albert Zenner and Christopher P. Michaelsen, concerning statements made by Freeman during an interview conducted at the VOA.

**A. Investigation of the VOA:**  Special Agent Zenner testified that in September 1999, he acted as the case agent for an investigation involving improper conduct by security

---

[1] Freeman's omnibus motion also sought, *inter alia*, discovery and inspection, *Brady* material, *Jencks* material, rulings on evidentiary matters under rules 404, 608 and 609 of the Federal Rules of Evidence, the preservation of rough notes and an audibility hearing.  (Docket # 16).  Each of these requests was either resolved by the parties or decided in open court by the undersigned on April 14, 2005.  (Docket ## 20, 21).

2

personnel at the VOA facility in Rochester, New York.  (Tr. 24).[2]  In connection with that investigation, Zenner arranged for a series of simultaneous interviews of VOA protective service officers ("PSOs").  (Tr. 24-25).  On September 16, 1999, Zenner and Special Agent Testani met with all of the PSOs in a large room at the VOA.  Zenner informed the PSOs that he was investigating allegations that prisoners had been permitted to leave the residence without authorization and requested their cooperation in the matter.  (Tr. 25-26).  Zenner explained that he and other agents wished to speak with each PSO individually to determine whether the PSO had any information.  Freeman was one of the PSOs present at the meeting.  (Tr. 26).

Following the large group meeting, the agents were divided into teams of two and assigned an office within the VOA, which was to serve as an interview room.  (Tr. 26-27).  The agents were directed to take statements from the PSOs and were advised that no arrests would be made that day.  (Tr. 27).  Each of the PSOs then reported to the interview rooms for questioning.  (Tr. 27).  Zenner testified that the PSOs were not threatened with criminal charges if they refused to be interviewed (Tr. 28-29); he did not testify whether any PSOs declined to be interviewed.

**B. Interview of Freeman:**  Special Agent Michaelsen testified concerning the interview of Freeman.  Michaelsen stated that on September 16, 1999, he and Special Agent Aldis Lemesis conducted the interview in an office on the second floor of the VOA.  (Tr. 11).  According to Michaelsen, Freeman was not restrained in any way during the interview, and the door to the room was unlocked.  (Tr. 12).  When Freeman entered the room, the agents identified

---

[2] The transcript of the suppression hearing conducted before this Court on June 13, 2005, shall hereinafter be referenced as "Tr. __."  (Docket # 31).

themselves and displayed their credentials, but did not advise him of his *Miranda* rights. (Tr. 13).

Agent Lemesis explained to Freeman that they needed to speak with him about irregularities in the VOA log books and whether residents under court order may have been permitted to leave without authorization. (Tr. 15-16). Freeman responded that he was unaware of the log book irregularities, but stated that he had heard rumors of irregularities with "prisoners coming and going out of there." (Tr. 17). Michaelsen testified that at no time during the interview did Freeman ask to leave the room or request an attorney. Freeman appeared to understand what was happening during the interview and did not appear to be under the influence of any drugs or alcohol. (Tr. 13, 21-22). Michaelsen further testified that neither he, nor Lemesis advised Freeman that he faced the possibility of incarceration if he did not speak with them or threatened him in any other way. (Tr. 23). The entire interview lasted for less than one hour. (Tr. 20). Once the questioning concluded, Freeman was permitted to leave. (Tr. 14).

## DECISION AND ORDER

Freeman moves to suppress all statements made by him while in the interview room at the VOA on the grounds that he was not advised of his Fifth Amendment rights. (Docket ## 16, 21, 22). The government opposes such motion, claiming that Freeman made the challenged statements voluntarily and that he was not in custody at the time. (Docket # 17).

In *Miranda v. Arizona*, 384 U.S. 436 (1966), the United States Supreme Court held that the government may not use a defendant's statements that are the product of custodial interrogation unless it demonstrates that the defendant was first warned of his Fifth Amendment

privilege against self-incrimination and then voluntarily waived that privilege.  Here, the government concedes that Freeman was not advised of his *Miranda* warnings prior to questioning by Agents Michaelsen and Lemesis.  Rather, the government contends that the *Miranda* warnings were unnecessary because Freeman was not in custody at the time he made the statements.

>As the Second Circuit Court has articulated,
>
>Custodial interrogation exists when a law enforcement official questions an individual and that questioning was (1) conducted in custodial settings that have inherently coercive pressures that tend to undermine the individual's will to resist and to compel him to speak (the in custody requirement) and (2) when the inquiry is conducted by officers who are aware of the potentially incriminating nature of the disclosures sought (the investigative intent requirement).

*United States v. Rodriguez*, 356 F.3d 254, 258 (2d Cir. 2004) (citing *United States v. Morales*, 834 F.2d 35, 38 (2d Cir. 1987) (internal citations omitted)).  In determining whether a defendant was in custody, the court must consider "the objective circumstances of the interrogation, not the subjective views harbored by either the interrogating officers or the person being questioned." *Yarborough v. Alvarado*, 124 S. Ct. 2140, 2148-49 (2004) (quoting *Stansbury v. California*, 511 U.S. 318, 323 (1994)).  First, the court must determine whether a reasonable person would have felt free to terminate the questioning and leave police encounter.  *Id.* at 2149.  *See also United States v. Newton*, 369 F.3d 659, 672 (2d Cir. 2004), *cert. denied*, 125 S. Ct. 371 (2004).  If the answer is affirmative, the inquiry concludes.  *Id.*  If, however, the reasonable person would not have felt free to leave, the court must then proceed to the second step of the analysis and determine whether, in addition to feeling not free to leave, the "reasonable person would have

understood his freedom of action to have been curtailed to a degree associated with formal arrest." *Id.* (citing *California v. Beheler*, 463 U.S. 1121, 1125 (1983)). "Only if the answer to this second question is yes was the person 'in custody for practical purposes' and 'entitled to the full panoply of protections prescribed by *Miranda*.'" *Id.* (quoting *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984)); *see United States v. Mitchell*, 966 F.2d 92, 98 (2d Cir. 1992) ("[d]ecisions in this circuit have emphasized that in the absence of actual arrest, an interrogation is not 'custodial' unless the authorities affirmatively convey the message that the defendant is not free to leave").

In this matter, Zenner first addressed all PSOs and informed them that an investigation was being conducted relating to residents under court orders who were permitted to leave the VOA without authorization. Zenner testified that he requested that the PSOs cooperate with the interviews and did not threaten them with criminal charges or otherwise if they refused to answer questions. (Tr. 25-29). The PSOs were not physically restrained during this group meeting. (Tr. 28).

With respect to Freeman, Michaelsen testified that he interviewed Freeman in a private office at the VOA. (Tr. 11). According to Michaelsen, at no time during the interview did Freeman ask to leave. (Tr. 13). Freeman was not handcuffed, and the door to the interview room was unlocked. (Tr. 12). He appeared to understand what was happening during the interview and did not appear to be under the influence of drugs or alcohol. (Tr. 13, 22). Michaelsen further testified that Freeman was not threatened with incarceration if he refused to answer questions. (Tr. 23). The entire interview lasted for less than one hour, after which Freeman was permitted to leave. (Tr. 14, 20).

On this record, I find that Freeman was not in custody at the time of the interview. Nothing in the agents' words or actions conveyed the message that Freeman was not free to leave, and thus a reasonable person in Freeman's position would have believed himself free to do so. *See United States v. Newton*, 369 F.3d at 672.  Moreover, even if Freeman had not felt free to leave the interview, a reasonable person in his position would not have believed his freedom of action to have been curtailed to the degree normally associated with formal arrest. *Id.*  Freeman acknowledges that he was not handcuffed or otherwise physically restrained during the interview. S*ee id.* at 67-76 ("[h]andcuffs are generally recognized as a hallmark of a formal arrest") (citing *New York v. Quarles*, 467 U.S. 649, 655 (1984) (handcuffed defendant deemed to have been in custody)); *United States v. Maguire*, 359 F.3d 71, 79 (1st Cir. 2004) (fact that defendant was not handcuffed weighed in favor of finding that he was not in custody).

In addition, as stated above, the interview was conducted in an unlocked office at the VOA – Freeman's place of employment. *See United States v. Okwumabua*, 828 F.2d 950, 952-53 (2d Cir. 1987) (finding that interview conducted at defendant's place of business and lasting approximately one hour was not custodial because no evidence existed that any promises had been made to defendant or that he had been threatened or coerced), *cert. denied*, 484 U.S. 1063 (1988).  Accordingly, considering all the circumstances surrounding Freeman's interview, I find that he was not subject to custodial interrogation and thus was not entitled to a reading of his Fifth Amendment rights.  Freeman's motion to suppress statements made during the interview at the VOA on the grounds that he was not advised of his *Miranda* warnings is therefore denied.

## CONCLUSION

For the foregoing reasons, it is my decision and order that defendant's motion to suppress statements **(Docket ## 16, 21)** is **DENIED**.

**IT IS SO ORDERED.**

                                           *s/Marian W. Payson*
                                              MARIAN W. PAYSON
                                           United States Magistrate Judge

Dated: Rochester, New York
       November  10  , 2005.